1

2

3

4

5

6

7     UNITED STATES DISTRICT COURT

8     WESTERN DISTRICT OF WASHINGTON

9     AT TACOMA

10    ALLSTATE INSURANCE COMPANY,          Case No. 3:13-cv-5214
      ALLSTATE PROPERTY & CASUALTY
11    INSURANCE COMPANY, ALLSTATE          **PLAINTIFFS' MOTION FOR PARTIAL**
      INDEMNITY COMPANY, and ALLSTATE      **SUMMARY JUDGMENT**
12    FIRE & CASUALTY INSURANCE
      COMPANY,
13                                         **Noted For Consideration: July 31, 2015**
                   Plaintiffs,
14
             v.
15
      TACOMA THERAPY, INC., TACOMA
16    REHABILITATION THERAPY, INC., P.S.,
      ANDREW JACOBS, MELANIE JACOBS,
17    NANDY, INC., NATHAN LEMINGS AND
      JANE DOE LEMINGS, husband and wife,
18    and the marital property thereof, THE LAW
      OFFICE OF MCLAUGHLIN &
19    ASSOCIATES, INC., WESLEY
      MCLAUGHLIN AND JANE DOE
20    MCLAUGHLIN, husband and wife, and the
      marital    property    thereof,    DIRECT
21    SOLUTIONS MARKETING, INC., DOES 1-
      100 and ROES 101-200,
22
                   Defendants.
23

24

25

26

27

# I. INTRODUCTION

Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively "Allstate") respectfully seeks judgment as to liability from this Court against remaining Defendants Andrew Jacobs and Direct Solutions Marketing, Inc. ("DSM"), concluding that each Defendant is liable under the following causes of action set forth in Allstate's First Amended Complaint:

Count One:     Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(c) – Conduct of Enterprise Through Racketeering

Count Two:     Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(d) – Conspiracy

Count Three:  Washington RICO Violations – RCW 9A.82.100

Count Four:    Fraud and Intentional Misrepresentation

Count Five:    Conspiracy to Defraud

Count Six:     Violation of the Washington Consumer Protection Act, RCW 19.86, *et seq.*

By way of this Motion for Partial Summary Judgment, Allstate does not seek a determination by this Court as to its damages. Rather, Plaintiffs seek a determination as to Defendants Andrew Jacobs and Direct Solutions Marketing's liability under the above-listed causes of action. The evidence is undisputed Andrew Jacobs masterminded a complex fraud scheme involving numerous individuals and business entities, where the sole purpose was to fraudulently inflate medical bills and associated personal injury settlements paid by insurance companies such as Allstate. Andrew Jacobs improperly and illegally owned and controlled businesses, including two healthcare entities and a law firm, that he used to run up unnecessary medical billings and associated personal injury settlements, which were paid by auto insurance carriers such as Allstate. Andrew Jacobs used improper referral and kickback schemes with payoffs to other medical providers, tow truck companies, and collision centers to drum up business for his massage and physical therapy clinics. He also used kickbacks with his own healthcare employees to get referrals to his law firm, in order to keep as much control as possible over the money generated from the improper treatment at his clinics. Jacobs started and used

DSM to launder money from his illegally-owned law firm, moving the money both back into his pocket and using it as a slush fund for the illegal kickbacks and payoffs. Allstate was a victim of this fraud scheme, and by this action seeks to recoup money paid on underlying claims pursuant to Allstate auto policies.

## II.  STATEMENT OF FACTS

This fraud scheme began in 2006, when Andrew Jacobs incorporated Tacoma Therapy, Inc., ("TMT"), a massage therapy clinic.  (Please see Plaintiffs' Separate Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment filed concurrently herewith ("UMF", UMF No. 1.)  Andrew Jacobs owned the clinic along with his wife, Melanie Jacobs. (UMF No. 2.)  Andrew Jacobs filed the incorporation papers for TMT and was a controlling officer from its inception to its sale in 2012. (UMF No. 3.)  However, Andrew Jacobs was never licensed in the State of Washington as a massage therapist.  (UMF No. 4.)  His wife Melanie Jacobs was a licensed massage practitioner.  (UMF No. 5.)  Andrew Jacobs managed TMT, with limited input from his wife, and exercised control over all business decisions.  (UMF No. 6.)

It was the practice of TMT to focus on treating car accident patients who were either covered by Personal Injury Protection under their auto policies, or were represented by counsel in a personal injury claim against another driver.  (UMF No. 7.)  Andrew Jacobs kept TMT focused on such clientele so that he could manipulate the amount of treatment received by the patients with no out-of-pocket cost to the patient, instead passing the cost on to insurance companies such as Allstate.  (UMF No. 8.)

After several years of this lucrative fraud scheme, Andrew Jacobs decided to expand into physical therapy in order to further collect on inflated medical treatment.  In 2008, Andrew Jacobs incorporated Tacoma Rehabilitation Therapy, Inc., ("TRT"), a physical therapy clinic. (UMF No. 9.)  Andrew Jacobs owned the clinic along with his wife, Melanie Jacobs.  (UMF No. 10.)  Andrew Jacobs filed the incorporation papers for TRT and was a controlling officer from its inception to its sale in 2012. (UMF No. 11.)  However, Andrew Jacobs was never licensed in the

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 3

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

State of Washington as a physical therapist, nor was his wife Melanie Jacobs. (UMF No. 12.) Andrew Jacobs managed TRT as well, and exercised control over all business decisions. (UMF No. 13.)

In order to further control all profits stemming from treatment of these auto accident claims, Andrew Jacobs also schemed to set up a law firm to handle third-party personal injury actions. He partnered with Wesley McLaughlin, funding the Law Office of McLaughlin & Associates, Inc., whose primary focus was personal injury auto accidents. (UMF No. 14.) Andrew Jacobs admitted in his deposition to the law firm being a 50/50 partnership, with profits to be split. (UMF No. 15.) Andrew Jacobs' goal was to direct TMT and TRT patients to McLaughlin Law, and vice versa, so that Andrew Jacobs would not only profit off of the inflated massage therapy treatment, but also profit on the back end by way of collecting attorney fees out of the general damages portion of a personal injury settlement. (UMF No. 16.) Andrew Jacobs funded the law firm. (UMF No. 17.) McLaughlin Law operated in close connection with Andrew Jacobs. (UMF No. 18.)

Andrew Jacobs' relied upon Nate Lemings to help direct the trafficking of patients to and from the law firm. (UMF No. 19.) Lemings, a non-attorney, was an employee of McLaughlin Law, which in turn made him Jacob's employee, as Jacobs held an ownership interest in McLaughlin Law. (UMF No. 20.) Lemings spent a majority of his time at TMT and TRT signing up patients for representation with McLaughlin Law. (UMF No. 21.) Lemings described his role in this fraud scheme in detail at his deposition. Lemings started working for McLaughlin Law in 2006 as the "marketing director." (UMF No. 22.) Lemings stated that he knew that Andrew Jacobs had an ownership interest in McLaughlin Law from around the time that he started working there in 2006. (UMF No. 23.) Andrew Jacobs later told Lemings that he was a 50/50 owner of McLaughlin Law. (UMF No. 24.) Lemings was told that his job duties were to market the law firm to medical providers, tow companies and collision centers. (UMF No. 25.) This marketing consisted of, at Andrew Jacobs direction, distributing gift cards and cash to other medical providers and tow truck drivers for referrals to McLaughlin Law. (UMF No. 26.) He

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 4

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1  was told to provide gift cards to medical providers in exchange for referral of clients to

2  McLaughlin Law. (UMF No. 27.) Specifically, Lemings stated that employees of TMT and

3  TRT, as well as employees of tow companies and collision centers, were given gift cards ($100

4  Visa Cards) and cash payments for referral of clients to McLaughlin Law. (UMF No. 28.)

5  Lemings testified that a majority of McLaughlin Law clients came from TMT and TRT. (UMF

6  No. 29.) Lemings stated that Andrew Jacobs was aware of and supported the referral process.

7  (UMF No. 30.)

8      Lemings also stated that massage therapists and physical therapists at TMT and TRT were

9  paid with $100 bonuses, for referring patients to McLaughlin Law. (UMF No. 31.) In addition,

10 employees that proved to be top referral sources to McLaughlin Law were given additional gifts

11 such as jackets, iPods, dinners, and vacations. (UMF No. 32.) Former employee Jackie Bennett

12 corroborated that this was happening. (UMF No. 33.) Andrew Jacobs also instructed employees

13 to hand out gift cards to referring providers so that they would refer patients to TMT and TRT.

14 (UMF No. 34.)

15     The connection between TMT, TRT and McLaughlin Law cannot be understated.

16 Lemings said he viewed himself as having two bosses, Andrew Jacobs and Wesley McLaughlin.

17 Lemings signed payroll at TMT and TRT from time to time, and was involved in the hiring and

18 firing of TMT and TRT employees. (UMF No. 35.) However, he only was paid from

19 McLaughlin Law. (UMF No. 36.) Further Lemings testified that McLaughlin Law was well

20 known for not reducing medical bills and that providers referred clients to him because it got

21 medical providers paid, putting the interest of the providers above those of the clients. (UMF No.

22 37.)

23     Andrew Jacobs exerted control over employees by instituting policies and procedures at

24 TMT, and later TRT, which set in motion his fraud scheme. Andrew Jacobs drafted, signed and

25 issued a handbook to its employees entitled "Tacoma Therapy, Inc. Office Policy Handbook"

26 ("The Handbook") - in which Andrew and Melanie Jacobs listed themselves as "owners" – which

27 instructed employees on providing massage therapy and physical therapy to patients. (UMF No.

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 5

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1    38.) There was a "quota" system in place, which required practitioners to treat a minimum
2    number of patients per week, and treat patients a minimum number of times before being
3    released. (UMF No. 39.) Employees could be and were fired if they did not meet their minimum
4    quotas as stated in The Handbook. (UMF No. 40.) The threat of being fired for not meeting the
5    minimum pre-programmed quotas caused numerous employees to treat patients well beyond what
6    was reasonable and necessary. (UMF No. 41.) Former patients testified that they felt over-
7    treated. (UMF No. 42.) Further, this also led to billing for treatment not rendered. Several
8    patients stated that they were typically only seen for massages at TMT for less than hour, but
9    were charged for a full hour. (UMF No. 43.) This practice was confirmed by multiple former
10   employees. (UMF No. 44.)

11        Further, beyond the threat of being fired, Andrew Jacobs also instituted what can be
12   described as a "patient retention program" whereby he paid employees bonuses based on the
13   number of times they treated a patient. (UMF No. 45.) This program unethically incentivized the
14   staff to see patients beyond what was medically necessary. (UMF No. 46.) Generally TMT's
15   massage practitioners were required to see at least 35 patients per week and TRT's physical
16   therapists were required to see 12 to 18 patients per day. (UMF No. 47.) Further, the TMT
17   massage practitioners were told to see individual patients, at a minimum, for 32 total visits, and
18   would receive cash bonuses if they hit the targets of 32 and 41 visits. (UMF No. 48.) The
19   massage practitioners, for example, would receive a $50 bonus for providing a patient with 32
20   massages, and a $150 bonus for 41 massages. (UMF No. 49.) The "patient retention program"
21   was tracked on a form that was kept within the claimant's medical file. (UMF No. 50.)
22   However, the billing coordinator, Meghan Lawrence, was instructed by Andrew Jacobs to not
23   disclose that form pursuant to a subpoena or request for medical records from an insurance
24   company. (UMF No. 51.) Employees were known to track down patients to get them to come in
25   for more treatment so they could get their bonuses and to meet their required quota. (UMF No.
26   52.)

27        Andrew Jacobs also had a strategy to attempt to avoid detection of the fraudulent and

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 6

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

inflated treatment and maximize the probability of payment. He instructed his employees to bill up to a certain dollar amount ($6,500) on massage, because billing more than that amount would not be convincing to a judge or arbitrator. (UMF No. 53.) Conversely, in third party claims, Andrew Jacobs required the massage practitioners and physical therapists to cease treating their patient if the patient was unrepresented after five (5) visits, as he considered these patients a financial liability. (UMF No. 54.)

Andrew Jacobs' improper medical treatment scheme was quite effective at inflating treatment well beyond what was medically necessary. Allstate's expert, Dr. Edward Dagher, is a Board certified physiatrist, well-versed in assessing physical therapy and massage therapy treatment received by the underlying claimants at issue here. (UMF No. 55.) Dr. Dagher reviewed medical records and bills for all 179 of the underlying claims at issue in this case. (UMF No. 56.) In his expert opinion, which is detailed in his expert report, Dr. Dagher concluded that the records contained:

• pattern of pre-determined, pre-programmed, unsubstantiated care that had nothing to do with patient care;

• exaggerated clinical findings;

• metastasis of treatment;

• inappropriate referrals;

• unreasonable charges;

• misleading clinical information;

• reports of physical findings that were not supported within reasonable medical probability;

• modes of care that were not supported as medically necessary;

• clearly excessive treatments; and

• unreasonably high charges for treatments.

(UMF No. 57.)

These findings lead Dr. Dagher to conclude that the course of treatment provided at both

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 7

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1  TMT and TRT was often exaggerated.  (UMF No. 58.)  In his report, Dr. Dagher goes on to opine

2  about the proper level of treatment that was likely reasonable and necessary for a given

3  underlying claimant.  (UMF No. 59.)  In the vast majority of cases, Dr. Dagher recommended a

4  substantial reduction in the number of treatments rendered at TMT and TRT.  (UMF No. 60.)

5      Allstate paid on these underlying claims two ways.  First, Allstate paid TMT and TRT

6  directly on PIP claims when TRT and TMT would submit their invoices to Allstate, either by

7  mail, email, or fax, for reimbursement under the respective Allstate auto policy's PIP coverage.

8  (UMF No. 61.)  Allstate would also issue payments to attorneys for the underlying claimants in

9  third party or UIM claims.  TMT and TRT would submit invoices to the respective attorneys, and

10 in turn the attorneys would make a demand upon Allstate based on said documentation,

11 communicated either by mail or email to Allstate.  (UMF No. 62.)  A substantial number of these

12 third party cases were handled by McLaughlin Law.  (UMF No. 63.)

13     Because Andrew Jacobs was sharing profits with McLaughlin from the law firm, the

14 money needed to be transferred to Jacobs in such a way that it would not be obvious that Andrew

15 Jacobs had a financial interest in the law firm.  To remedy this, Andrew Jacobs started a

16 "marketing" company, Direct Solutions Marketing, Inc. ("DSM").  (UMF No. 64.)  McLaughlin

17 Law made substantial payments to DSM for "marketing" services, when little legitimate

18 marketing was ever actually conducted by DSM.  (UMF No. 65.)  The reality was that DSM was

19 just a conduit for Andrew Jacobs to collect his share of law firm profits.  (UMF No. 66.)  From

20 2008 to 2012, McLaughlin Law transferred over $1 million to DSM accounts.  (UMF No. 67.)

21 Andrew Jacobs even admits that money was transferred for his share of profits from personal

22 injury settlements.  (UMF No. 68.)

23     The role of DSM is supported by Nate Lemings' deposition testimony.  Lemings stated

24 that DSM was started to funnel money from McLaughlin Law to Jacobs.  (UMF No. 69.)  DSM's

25 employees Amy Crawford, Amy Young and Lisa Molding, were instructed to market TMT and

26 TRT to medical providers.  (UMF No. 70.)  Lemings confirmed that Andrew Jacobs' profits from

27 McLaughlin Law were sent to him through DSM.  (UMF No. 71.)  Lemings said that Andrew

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 8

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1     Jacobs and McLaughlin instructed him to transfer funds to DSM. (UMF No. 72.)

2        Allstate has retained Steve Scheets, a forensic accountant, as its expert to review financial

3 records and transactions of the Defendants in this case. (UMF No. 73.) Mr. Scheets' review of

4 these records has led him to conclude in his expert opinion that numerous factors indicate

5 Andrew Jacobs had an ownership interest, or at a minimum, extraordinary influence and control

6 over Law Office of McLaughlin & Associates. (UMF No. 74.) These factors are usually

7 associated with a person has an ownership interest or financial interest in the entity. (UMF No.

8 75.) Mr. Scheets also is of the opinion that DSM was not a legitimate marketing entity. (UMF

9 No. 76.) Mr. Scheets found that payments from McLaughlin Law to Andrew Jacobs and DSM

10 from 2007 to 2009, and the "Flyte" personal injury settlement payment in 2010, were deliberately

11 off the books of McLaughlin Law. (UMF No. 77.) Mr. Scheets believes the reason the

12 transactions were off the books was to conceal that Andrew Jacobs either had an ownership

13 interest or at a minimum a financial interest in McLaughlin Law. (UMF No. 78.) Mr. Scheets

14 further is able to conclude based on financial transactions that Andrew Jacobs had influence over

15 McLaughlin Law as demonstrated by the flow of funds from McLaughlin Law to Jacobs and

16 DSM. (UMF No. 79.)

17        Further, Andrew Jacobs and Melanie Jacobs, through their ownership and control of TMT

18 and TRT, were violating the corporate practice of medicine doctrine. As such, all bills derived

19 from TMT and TRT's operations were illegal, unreasonable, and unnecessary. Allstate's expert,

20 John C. Peick, Esq., is a Washington licensed attorney with substantial experience in healthcare

21 law. (UMF No. 80.) Mr. Peick reviewed numerous documents regarding Andrew Jacobs'

22 ownership and operation of TMT and TRT. (UMF No. 81.) In Mr. Peick's expert opinion, as

23 detailed in his expert report, it is illegal for laypersons to own or operate a healthcare facility.

24 (UMF No. 82.) Specifically, licensed healthcare providers may only operate as a professional

25 service corporation (PS), professional limited liability company (PLLC), or limited liability

26 partnership (LLP) in the State of Washington, and unlicensed persons may not be shareholders,

27 directors, or officers in a PS, PLLC, or LLP. (UMF No. 83.) Mr. Peick is further of the opinion

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 9

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1  that healthcare practices operated by laypersons are engaged in the illegal practice of medicine,

2  and therefore the billings of illegal entities are void and unenforceable and subject to recoupment

3  by the payor.  (UMF No. 84.)  It is undisputed that Andrew Jacobs was not a licensed massage

4  therapist or physical therapist, and therefore could not own a massage clinic or therapy clinic.

5  (UMF No. 85.)  Where Andrew Jacobs was an owner, controlling officer, and manager of TMT

6  and TRT, the billing for services from these clinics are illegal and unenforceable.  (UMF No. 86.)

7  Andrew Jacobs managed and controlled TMT and TRT up until September 2012, when he

8  sold both entities.  (UMF No. 87.)  Andrew Jacobs also managed and controlled McLaughlin Law

9  up until the fall of 2012, when Jacobs "sold" his interest in McLaughlin Law.  (UMF No. 88.)

10  The sale is memorialized in a "non-compete" agreement involving DSM.  (UMF No. 89.)  While

11  on its face the "non-compete" agreement involves marketing, the contents demonstrate both that

12  Jacobs' was sharing and claimed entitlement to profits from McLaughlin Law, and the level of

13  control Andrew Jacobs claimed to have over the active files at McLaughlin Law.  Andrew Jacobs

14  even included a provision in the non-compete that he could have McLaughlin's files moved to

15  another law firm for non-payment.  (UMF No. 90.)  Jacobs admitted at his deposition that he sold

16  his ownership interest in McLaughlin Law in 2012 for $1.4 million.  (UMF No. 91.)  This was

17  memorialize by the "non-compete" contract between McLaughlin Law and DSM regarding

18  marketing, however, Jacobs admitted the contract really represented the buyout of his share of

19  McLaughlin Law.  (UMF No. 92.)

20  Allstate relied on the factual representations made by Defendants, both through invoices

21  submitted directly from TMT and TRT, and in communications received from McLaughlin Law

22  and other law firms involving treatment at TMT and TRT.  (UMF No. 93.)  Allstate relies upon

23  demand packages from attorneys when evaluating claims.  (UMF No. 94.)  Allstate also relies

24  upon invoices from medical service providers when evaluating claims.  (UMF No. 95.)  Both

25  demand packages and TMT/TRT invoices were sent to Allstate, either by U.S. Mail, email, or

26  facsimile.  Allstate issued payments on the underlying claims based on these misrepresentations,

27

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 10

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

with all Allstate checks processed and issued from Houston, Texas. (UMF No. 96.)[1] Had Allstate been aware of the fraud being conducted by Defendants, it would not have paid any amount directly to TMT and TRT for the purported services provided to the underlying claimants, nor would Allstate have considered TMT and TRT invoices in evaluating any third party claim. (UMF No. 98.)

## III.   LEGAL ARGUMENT

### A.   Standards On Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Jenkins v. Washington*, 46 F. Supp. 3d 1110, 1114 (W.D. Wash. 2014). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hodges v. Delta Air Lines, Inc.*, 2010 WL 5463832, at *1 (W.D. Wash. 2010).

Moreover, a party may seek summary judgment as to each individual claim, or partial summary judgment for that matter:

> Nothing in Rule 56 demands an all-or-nothing approach to summary judgment. Requests for (and grants of) partial summary judgment, including summary judgment as to fewer than all parties and claims, are nothing new. See, e.g., *Leonard v. Socony–Vacuum Oil Co.*, 130 F.2d 535, 536 (7th Cir.1942). The rule, in fact, expressly anticipates that a party may seek summary judgment as to a limited portion of its case when it provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed.R.Civ.P. 56(a). There is no doubt that a court may grant, and a party may seek, summary judgment as to one party or one claim, leaving other claims and other parties to be addressed at a later point in the litigation. See 10A FED. PRAC. & PROC. § 2715, at 254.

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015); see *Experience Hendrix, L.L.C. v. HendrixLicensing.Com, LTD*, 2010 WL 5463822, at *2-3 (W.D. Wash. 2009).

Under summary judgment practice, the moving party always bears the initial

---

[1] Allstate's total payments to TMT and TRT on the 179 underlying claims at issue, and the claimed share of general damages associated with the McLaughlin Law firm, totals $899,860.39. (UMF No. 97.) Treble damages pursuant to Federal RICO totals $2,699,581.15.

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 11

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.*

Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322; *Dixon v. City of Forks*, 2009 WL 1608506, at *1 (W.D. Wash. 2009). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 586 n. 11; *Steele v. Extendicare Health Servs., Inc.*, 607 F. Supp. 2d 1226, 1230 (W.D. Wash. 2009).

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, *supra,* 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626,

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 12

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

630 (9th Cir.1987); *Jenkins v. Washington*, *supra,* 46 F. Supp. 3d at 1114. The non-moving party must demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir.1987).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed.R.Civ.P. 56(c). The evidence of the opposing party is to be believed. *Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Matsushita*, 475 U.S. at 587 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45 (E.D.Cal.1985), aff'd, 810 F .2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted); *Moba v. Total Transp. Servs. Inc.*, 16 F. Supp. 3d 1257, 1263 (W.D. Wash. 2014).

**B.** **Count One -Allstate Is Entitled To Summary Judgment Under Federal RICO**

RICO makes it a crime to conduct or participate in an enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as "predicate acts") (5) causing injury to the plaintiff's "business or property." 18 U.S.C. §§ 1964(c), 1962(c); *Sedima S.P.R.L. v. IMREX Co.,* 473 U.S. 479, 496 (1985).

RICO is to be read broadly not only because of Congress' expansive language and overall approach, but also because of its express admonition that the Act is to be *liberally construed* to effectuate its remedial purposes. *See Sedima v. Imrex Co., supra.* At 496; *Odom v. Microsoft*

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 13

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

*Corp.,* 486 F.3d 541, 547 (9th Cir. 2007)  [In analyzing the RICO claims, the statutory terms of RICO should not be read narrowly but, rather, to be "read broadly."].

### 1. The Undisputed Facts Establish the Defendants Conducted An Enterprise

As noted above, RICO makes it a crime to conduct or participate in an enterprise's affairs through a pattern of racketeering activity. (18 U.S.C. §1962(c).)  Pursuant to §1962(c), it is unlawful "for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs" through the commission of two or more statutorily defined crimes, which RICO calls "a pattern of racketeering activity."  "The term 'enterprise' is defined in 18 U.S.C. § 1961(4) as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'"  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)  "An associated-in-fact enterprise under [RICO] does not require any particular organizational structure, separate or otherwise."  *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007), *citing United States v. Turkette*, 452 U.S. 576 (1981).  "It is undisputed that a corporation can be an "individual" for purposes of an associated-in-fact enterprise."  *Odom, supra*, 486 F.3d at 548.  The court in *Living Designs* held that a corporation and its law firms can constitute an enterprise. *Id.* at 361.

For purposes of establishing an "enterprise," one must allege and prove the existence of two distinct entities, a "person" and an "enterprise" that is not simply the same "person" referred to by a different name.  The United States Supreme Court in *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158 (2001) held that an individual acting within the scope of his authority for a corporation was distinct from the corporation, and thus was subject to the RICO provision prohibiting "a pattern of racketeering activity."  When a corporate employee, acting within the scope of his authority, allegedly conducts the corporation's affairs in a RICO-forbidden way, Justice Breyer stated the corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.  Nothing in RICO requires more separateness than that.  *Id.* at 164; *see*

*Acme Am. Repairs, Inc. v. Katzenberg,* 2010 WL 3835879, at *5 (E.D.N.Y. 2010), *citing Kushner*, *supra*, 533 U.S. at 164. [enterprise adequately pleaded because corporation alleged to be RICO enterprise had separate legal identity distinct from that of defendant shareholders]; *Allstate Ins. Co. v. Rozenberg*, 590 F. Supp. 2d 384, 391 (E.D.N.Y. 2008) (same); *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007); *Warfield v. Gardner*, 346 F.Supp.2d 1033, 1051, 1052 (D. Ariz. 2004).

"[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, §1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993). "The crucial question is ... whether and to what extent that person controls the course of the enterprise's business." *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 913 F.2d 948, 954 (D.C. Cir. 1990) Courts have held that if a person did any of following for the RICO enterprise, then it would likely be found that the person participated in the operation or management in that enterprise:

(1) being a true owner of the enterprise;

(2) misdiagnosing patients and performing the unnecessary treatments that drove the fraud;

(3) implementing the treatment regimens established by the owner of the enterprise;

(4) laundering the fraudulent proceeds of the alleged scheme;

(5) steering patients to the enterprise.

*Allstate Ins. Co. v. Rozenberg,* 590 F.Supp.2d 384, 391-392 (E.D.N.Y. 2008.)

All of the conduct identified in *Rozenberg,* is established through the undisputed facts detailed herein. The associated-in-fact enterprise created by Andrew Jacobs consisted of, at a minimum, persons Andrew Jacobs, Melanie Jacobs, Wesley McLaughlin, and Nate Lemings, and entities TMT, TRT, McLaughlin Law, and DSM, all of whom are "individuals" for purposes of the statute. This enterprise operated from its inception in 2006 up until the fall of 2012, when Jacobs sold TMT and TRT, and his interest in McLaughlin Law. (UMF Nos. 1,87,88.) Andrew Jacobs was clearly the primary point person for operation and management of this enterprise.

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 15

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1   (UMF Nos. 15, 17, 30, 38, 45.) Jacobs was the owner and exerted control over TMT and TRT.

2   (UMF Nos. 2, 10.) He also exerted control and had a financial interest in the profits from

3   McLaughlin Law. (UMF No. 15.)

4         The employees of TMT and TRT "implemented the treatment regimens established by the

5   owner of the enterprise," Jacobs. (UMF Nos. 38-52.) Pursuant to the quota and patient retention

6   system established by Jacobs, these employees wound up performing the unnecessary treatments

7   that drove the fraud. (UMF Nos. 58-60.) Further, Andrew Jacobs was responsible for hiring and

8   directing Nate Lemings, who was instructed to "steer patients to the enterprise" by getting

9   patients not only to TMT and TRT, but also to McLaughlin Law. (UMF Nos. 31-34.) Finally,

10   the proceeds from fraudulent billings either flowed to Jacobs through TMT and TRT directly in

11   the first party cases, or indirectly on the third party cases when McLaughlin would settle cases

12   involving TMT and TRT bills. (UMF Nos. 93-95.) Jacobs would collect his ill-gotten gains by

13   laundering the money through DSM, under the auspices of marketing expenses. (UMF Nos. 64-

14   68.) There is no doubt that an enterprise has been established for purposes of RICO, and that

15   Andrew Jacobs operated and managed the enterprise throughout its lifecycle.

16         **2.**    *The Undisputed Facts Establish a Pattern of Racketeering Activity*

17         A "pattern of racketeering activity" is defined in the statute to be "at least two acts of

18   racketeering activity" occurring within a ten year period. 18 U.S.C. § 1961(5). To constitute

19   a "pattern" the predicate acts must be "related" and "continuous." *H.J. Inc. v. Northwestern*

20   *Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The requirement

21   that the predicate acts be "related" means that "they share similar purposes, participants,

22   victims, methods, or other distinguishing characteristics; in short they must not be isolated or

23   sporadic." *See Howard v. Am. Online, Inc.,* 208 F.3d 741, 749 (9th Cir. 2000); *Wegbreit v.*

24   *Marley Orchards Corp.*, 793 F. Supp. 957, 963 (E.D. Wash. 1991) reinstatement granted, 793

25   F. Supp. 965 (E.D. Wash. 1992) [Predicates are related when they "have the same or similar

26   purposes, results, participants, victims, or methods of commission, or otherwise are

27   interrelated by distinguishing characteristics and are not isolated events.]

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 16

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

The requirement that the acts be "continuous" may be over a *"substantial period of time"* or "include a specific threat of repetition extending indefinitely into the future" or the predicate acts were *"part of an ongoing entity's regular way of doing business." H.J. Inc.,* 492 U.S. at 241-42. (Emphasis added); *Wegbreit v. Marley Orchards Corp., supra,* 793 F. Supp. At 962.

Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C. § 1341. So, any "mailing that is incident to an essential part of the scheme satisfies the mailing element," even if the mailing itself "contain[s] no false information." *Bridge v. Phoenix Bond & Indem. Co*., 128 S.Ct. 2131, 2138 (2008). Under the mail fraud statute, the question is not whether each defendant actually used the mail but whether each defendant could have reasonably foreseen that the mail would be used as part of the underlying scheme. *See Ikuno v. Yip,* 912 F.2d 306, 311 (9th Cir. 1990); *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir. 1989). "Direct proof of mailing is not required. Evidence of routine custom and practice can be sufficient to support the inference that something is mailed." *United States v. Green,* 745 F.2d 1205, 1208 (9th Cir. 1984). "The federal statute prohibiting mail fraud parallels section 1343." *United States v. Griffith,* 17 F.3d 865, 87 (6th Cir. 1994); see, 18 U.S.C. §1341.

In *Griffith*, the court held that the government establishes a violation of the mail fraud statute by proving both (1) a scheme to defraud, and (2) a mailing for the purpose of executing the scheme. Wire fraud violation requires a showing of the same things, the only difference being that a wire communication is required instead of a mailing. Furthermore, the defendant himself does not have to use the mails or interstate telephone lines, provided it is foreseeable that the mails or wire services could be used to further his scheme. *Griffith*, *supra*, 17 F.3d at 874.

> As to the evidence of a communication in furtherance of each of the wire and mail fraud counts, there is no requirement that the government produce direct proof in the form of telephone bills or the actual postmarked envelopes. If the government's circumstantial evidence will permit a reasonable inference that … a document was transmitted by the United States Postal Service, there is substantial evidence to support the conviction. Thus, in most cases, a witness's testimony that he … mailed or received a document in the mail, or that his company routinely posts and receives documents through the mail, will suffice.

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 17

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1     *Id.*, at 874-875.

2         Here, the undisputed facts demonstrate that there are at least 179 separate mailings and/or

3 wire transmissions of information included within medical records, diagnoses, and/or treatments

4 provided at TMT and TRT.  (UMF Nos. 61-63, 93-95.)  This includes sending medical records

5 and bills to attorneys for claimants, including McLaughlin Law, which in turn forwarded these

6 records and bills to Allstate in demand packages.  (UMF No. 94.)  It also includes TMT and TRT

7 directly submitting records and bills directly to Allstate, all for the purposes of carrying out the

8 enterprise's fraudulent scheme.  (UMF No. 93.)  The predicate acts further consist of mailing

9 and/or wire transmissions of fraudulent information to Allstate designed to enhance the value of

10 the underlying claimants' cases for purposes of supporting those claimants' artificially enhanced

11 settlement demand.  Specifically, McLaughlin Law mailed demand packages to Allstate, and

12 TMT and TRT sent invoices to Allstate through the mail.  (UMF No. 93.)  Andrew Jacobs

13 expected that Allstate would issue payments in response to these invoices and demand packages,

14 and utilize the mail in sending these payments.  Further, Andrew Jacobs frequently relied upon

15 text messages to direct funds to various accounts and business entities, in particular with Nate

16 Lemings.

17        **3.**      **The Undisputed Facts Establish that the Racketeering Activity Caused**
               **Damages to Allstate**

18

19     "[Plaintiffs] are not required to show that each individual predicate act caused them an

20 injury, but rather that the pattern of racketeering activity did."  *Just Film, Inc. v. Merch. Servs.,*

21 *Inc.*, 2012 WL 6087210, *12 (N.D. Cal. 2012), *citing Sedima S.P.R.L., v. Imrex Co.*, 473 U.S.

479 (1985).  Specifically, the *Sedima* Court held as follows:

22

23        Given that "racketeering activity" consists of no more and no less than
       commission of a predicate act, § 1961(1), we are initially doubtful about a

24        requirement of a "racketeering injury" separate from the harm from the predicate
       acts.  A reading of the statute belies any such requirement.  Section 1964(c)

25        authorizes a private suit by "[a]ny person injured in his business or property by
       reason of a violation of § 1962."  Section 1962 in turn makes it unlawful for "any

26        person"—not just mobsters—to use money derived from a pattern of racketeering
       activity to invest in an enterprise, to acquire control of an enterprise through a

27        pattern of racketeering activity, or to conduct an enterprise through a pattern of
       racketeering activity.  §§ 1962(a)–(c).  If the defendant engages in a pattern of
       racketeering activity in a manner forbidden by these provisions, and the

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 18

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c). There is no room in the statutory language for an additional, amorphous "racketeering injury" requirement *Id.* at 495,

"[A] plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim." *Just Film, Inc.*, *supra*, 2012 WL 6087210 at *12, *quoting Corley v. Rosewood Care Ctr.,* 388 F.3d 990, 1004 (7th Cir.2004). "Instead, the plaintiff must prove only an injury directly resulting from some or all of the activities comprising the violation." *Just Film, Inc.*, *supra*, 2012 WL 6087210 at *12, *quoting Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809 (7th Cir.1987); *also citing Deppe v. Trippe,* 863 F.2d 1356, 1366 (7th Cir.1988); *Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263, 1268 (3d Cir. 1987).

In *Deppe*, *supra*, 863 F.2d at 1366, the Seventh Circuit stated that "no requirement exists that the plaintiff must suffer an injury from two or more predicate acts, or from all of the predicate acts ... Thus, a RICO verdict can be sustained when a pattern of racketeering acts existed, but when only one act caused injury." Similarly, in *Kearny, supra,* 829 F.2d at 1268, the Third Circuit held that RICO required only injury from any predicate act. The court noted [r]eading into the statute a requirement that a civil plaintiff prove injury from the entire pattern rather than from any predicate act would, we believe, be inconsistent with the core congressional purposes behind its enactment. For example, if an organized crime group were to operate a protection racket, extorting money from each merchant in a community, then each merchant's injury would be separate, and therefore… none could recover." *Id.*

Based on the undisputed evidence presented here, it is clear that the pattern of racketeering activity caused damage to Allstate in the form of paying higher settlements of the claims being made against its insureds.

As detailed above, all of the medical bills for services from TMT and TRT arise from illegal entities operated in violation of the corporate practice of medicine and the Washington Professional Service Corporation Act, RCW 18.100, *et seq..* As such, all bills from both TMT and TRT that were submitted to Allstate and for which Allstate issued a payment, either directly or through third party settlements, were not valid and collectible claims and are subject to

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 19

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1  recoupment by the payor.[2]  (UMF Nos. 80-86; *see Deaton v. Lawson*, 40 Wash. 486, 490, 82 P.

2  879 (1905); *Sherwood v. Wise*, 132 Wash. 295,300-301, 232 P. 309 (1925); *State ex rel Standard*

3  *Optical v. Superior Court*, 17 Wash.2d 323, 334-335, 135 P.2d 839 (1943); *State v. Boren*, 36

4  Wash.2d 522, 531-32, 219 P.2d 566 (1950); *Morelli v. Ehsan*, 110 Wash.2d 555, 560-562, 756

5  P.2d 129 (1988); *Columbia Physical Therapy v. Benon Franklin Orthopedic Associates, PLLC, et*

6  *al*, 168 Wash.2d 421, 430-31, 228 P.3d 1260 (2010).)  These illegally inflated claims caused

7  Allstate damages as nothing should have been paid to or for services from TMT and TRT.  (UMF

8  No. 98.)  Yet Allstate did in fact issue payments based in part on TMT and TRT bills in all 179

9  claims at issue. (UMF No.96.)  The purpose of demonstrating the corporate practice of medicine

10  violation is not to show that Allstate is entitled to recovery based solely on this violation, but

11  rather to show the sophistication of the fraud scheme established by Jacobs.  Allstate is simply

12  detailing the conduct of the enterprise, and the corporate practice of medicine is a part of the

13  conduct to establish that Andrew Jacobs and DSM are liable.

14       Additionally, this fraud scheme led to inflated treatment for the 179 underlying claimants

15  based on Andrew Jacobs' direction and control of his treating employees.  (UMF Nos. 38-54.)

16  All of the medical bills for services from TMT and TRT arise from an illegal fraud scheme

17  amounting to mail fraud.  Andrew Jacobs directed his employees to treat TMT and TRT patients

18  not based upon clinical need, but based on quotas, focused on driving up bills and inflating

19  claims.  (*Id.*)  He expected patients to be treated a target number of times regardless of the

20  patients' condition.  (UMF Nos. 45-49.)  He threatened to fire and did fire the treating employees

21  who did not comply with his improper business model, while rewarding those financially who

22  did. (UMF Nos.40-41.)  Jacobs illegally owned part of McLaughlin Law, and used the law firm

23

---

24  [2] Allstate is not pursuing a private cause of action for violations of the corporate practice of
   medicine doctrine and the Washington Professional Service Corporation Act.  Rather, Allstate is
25  merely relying upon the illegal and unethical conduct that gives rise to these violations as
   evidence of a portion of the racketeering scheme devised by Defendants and perpetrated upon
26  Allstate.  Allstate is aware of this Court's ruling in State Farm Insurance Co. v. Jacobs, Case No.
   3:14-CV-05512, and notes that State Farm's causes of action were based upon unjust enrichment
27  and declaratory relief.  Allstate's position is factually, procedurally, and legally distinguishable,
   as Allstate is seeking partial adjudication of different causes of action with distinct elements.

1  and the medical facilities to channel patients between one another, in order to control the fraud

2  scheme. (UMF No. 15, 31-33.) Andrew Jacobs further directed payments to be made for

3  referrals, both referrals to TMT and TRT, and to McLaughlin Law. (UMF Nos. 31-34 .) Andrew

4  Jacobs used DSM to funnel his share of the ill-gotten profits out of McLaughlin Law and used

5  this money in part to support the gifts for referrals. (UMF Nos.64-68.) Because Jacobs was part

6  owner of McLaughlin Law, his kickback scheme for referrals to McLaughlin Law necessarily

7  supported the insurance trafficking. As discussed in detail below, this conduct amounts to

8  numerous state law criminal violations, including:

9       - Trafficking in insurance claims as defined in RCW 48.30A.015;

10      - Unlawful practice of law as defined in RCW 2.48.180;

11      - Health care false claims as defined in RCW 48.80.030; and

12      - Unlicensed practice of a profession or business as defined in RCW 18.130.190(7).

13      Due to this fraud scheme, Dr. Dagher has concluded that the vast majority of the 179

14  underlying claimants receive treatment far beyond what was medically necessary. (UMF No. 59.)

15  Dr. Dagher further provides his expert opinion on each claim as to what the appropriate level of

16  care would have been had the claimants been treated based on clinical necessity. (UMF No.60.)

17  Because Dr. Dagher has concluded the level of treatment was inflated, Allstate was necessarily

18  damaged where it paid beyond what was medically necessary for these 179 claimants. (UMF No.

19  96.)

20      The determination of the amount of damages and basis upon which damages can be

21  awarded is an issue to be adjudicated at trial, Allstate is only addressing damages for the purpose

22  of establishing necessary elements to prove liability. It is clear based on undisputed evidence that

23  Allstate has been harmed for purposes of establishing the "damages" element for purposes of this

24  Motion for Partial Summary Judgment. There are various theories of damages, any one of which

25  can be basis to award damages, and Allstate is not seeking a determination of said basis at this

26  stage, but rather leaving damages for trial.

27

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 21

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

## C.    Count Two - The Evidence Establishes A Conspiracy to Violate the RICO Statute

The Supreme Court in *Reves v. Ernst & Young,* 507 U.S. 170, 184 (1993), created the "operation management" test for determining RICO liability. Liability under Section 1962(c) is limited to "those who participate in the operation or management of an enterprise through a pattern of racketeering activity." *Reves*, *supra*, at 184; *United States v. Fernandez,* 388 F.3d 1199, 1228 (9th Cir. 2004). In *Reves*, the Supreme Court interpreted the language of Section 1962(c) to require proof that the defendant "participate[d] in the operation and management of the enterprise itself." Several years later, the Supreme Court in *Salinas v. United States,* 522 U.S. 52 (1997), rejected an argument that, for a defendant to be guilty of conspiring to commit a substantive RICO offense under Section 1962(d), the defendant must have committed or agreed to commit two predicate acts himself. *Id*. at 63-66.

After *Salinas*, the Ninth Circuit has held that a defendant is guilty of conspiracy to violate Section 1962(c) if the evidence shows that the defendant knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise. *Fernandez*, *supra,* 388 F.3d at 1230. To prove a RICO conspiracy violation, the plaintiff need not show that the defendant agreed to personally participate in the operation or management of the enterprise. *Fernandez*, *supra,* 388 F.3d at 1229; *see also Smith v. Berg,* 247 F.3d 532, 538 (3d Cir. 2001) [holding that "plain implication of the standard set forth in *Salinas* is that one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or to conspire with respect to, any particular element"]; *Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 967 (7th Cir. 2000) [holding defendant need not agree personally to be an operator or manager, but must knowingly agree to facilitate activities of those who operate or manage enterprise].

Based on the undisputed evidence presented here, it is without question that Andrew Jacobs acted as part of a conspiracy to violate the RICO statute by knowingly agreeing to facilitate a fraud scheme which includes the operation or management of a RICO enterprise described above. Andrew Jacobs, through his management and control of TMT and TRT,

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 22

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

intended to generate illegal medical bills from business operating in violation of the corporate practice of medicine, precisely because he could control how treatment was rendered and corresponding charges billed to insurers. (UMF Nos. 38-52; 84-85.) Next, Andrew Jacobs, through his management of TMT and TRT, intended to inflate medical bills that would be paid by insurers such as Allstate by directing his employees to treat patients not based on medical need, but on profit-driven quotas. (UMF Nos.45-52.) In the vast majority of cases, Andrew Jacobs was successful in executing his fraud scheme, as his employees provided treatment beyond what was medically necessary. (UMF Nos.58-59.) In some cases, patients would not be seen beyond what was medically necessary, for reasons outside of Andrew Jacobs control, but in every case the attempt was made to inflate treatment. Similarly, Andrew Jacobs attempted to further drive up his profits by controlling McLaughlin Law and participating in profits from settlements. (UMF Nos. 15, 66.) He directed Nate Lemings, a McLaughlin Law employee, to facilitate referral of TMT and TRT patients to McLaughlin Law. (UMF No.31-33.) Not every claimant treated at TMT and TRT who needed or wanted an attorney utilized McLaughlin Law, but Andrew Jacobs was successful in directing almost half of the 179 claimants to McLaughlin Law. (UMF No._.) From there, Andrew Jacobs would rely on McLaughlin Law to collect settlements based upon inflated TMT and TRT bills. The entire process was developed and controlled by Andrew Jacobs, leaving no doubt that he knowingly conspired to operate this fraud scheme.

### D. Count Three - The Undisputed Evidence Also Establishes A Violation of the Washington State RICO Statute

The Washington Criminal Profiteering Act provides that "[a] person who sustains injury to his or her person, business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity, or by an offense defined in RCW 9A.40.100, 9.68A.100, 9.68A.101, or 9A.88.070, or by a violation of RCW 9A.82.060 or 9A.82.080 may file an action in superior court for the recovery of damages and the costs of the suit, including reasonable investigative and attorney's fees." RCW 9A.82.100(1)(a). Washington law does not set forth specific elements needed to establish a civil claim under the act, but the Supreme Court of Washington has characterized the state's "Criminal Profiteering Act as a 'little RICO' statute,"

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 23

McCormick Barstow, LLP
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

and has suggested looking to federal RICO cases for guidance in interpreting the state act. *Winchester v. Stein*, 135 Wash. 2d 835, 848 (1998), *citing Rice v. Janovich*, 109 Wash.2d 48, 55 (1987).

The state act is not, however, identical to Federal RICO. The Washington act "requires three crimes in five years to show a pattern of criminal profiteering, compared to only two predicate crimes committed over ten years to show a pattern of racketeering activity under the federal act." *Bowcutt v. Delta N. Star Corp.*, 95 Wash. App. 311, 318 (1999). "To constitute a 'pattern,' the three acts must have the same or similar intent, results, accomplices, principals, victims or methods of commission, or be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events. A 'pattern' of profiteering is usually required before any of the special civil remedies apply." *Winchester, supra*, 135 Wash. 2d at 850. In *State v. Barnes*, 85 Wash. App. 638, 665-666 (1997), the Court held that to establish liability under RCW 9A.82.060: "[R]equires a showing that the defendant intentionally organized, managed, directed, supervised, or financed any three or more persons with the intent to engage in a pattern of criminal profiteering activity…The reference to leading three or more persons is not linked conjunctively to the commission of the three predicate acts. In other words, the defendant must lead three persons…And the defendant must intend to commit three acts of criminal profiteering…But there is no requirement that any of those three people actually engage in any of the charged acts of criminal profiteering. The defendant may engage in some of the activities with others and perform others alone."

Criminal profiteering is defined in the state act to include "any act, including any anticipatory or completed offense, committed for financial gain, that is chargeable or indictable under the laws of the state… as any of the following:"

(s) Leading organized crime as defined in RCW 9A.82.060[3].

---

[3] RCW 9A.82.060 provides in relevant part:

"(1) A person commits the offense of leading organized crime by:

(a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity; …"

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 24

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1 (ee) Trafficking in insurance claims as defined in RCW 48.30A.015[4];

2 (ff) Unlawful practice of law as defined in RCW 2.48.180[5];

3 (hh) Health care false claims as defined in RCW 48.80.030[6]; and

4 (ii) Unlicensed practice of a profession or business as defined in RCW 18.130.190(7)[7];

5 RCW 9A.82.010(4).

6 Further, there is no prerequisite under the act that someone is indicted first or charged

---

[4] "Insurance claim" means a claim for payment, benefits, or damages under a contract, plan, or policy of casualty or property insurance. Wash. Rev. Code Ann. § 48.30A.010 (West)

[5] (2) The following constitutes unlawful practice of law:

(a) A nonlawyer practices law, or holds himself or herself out as entitled to practice law;
(b) A legal provider holds an investment or ownership interest in a business primarily engaged in the practice of law, knowing that a nonlawyer holds an investment or ownership interest in the business;
(c) A nonlawyer knowingly holds an investment or ownership interest in a business primarily engaged in the practice of law;
(d) A legal provider works for a business that is primarily engaged in the practice of law, knowing that a nonlawyer holds an investment or ownership interest in the business; or
(e) A nonlawyer shares legal fees with a legal provider.

RCW 2.48.180(2).

[6] Section 48.80.030 provides in relevant part:

(1) A person shall not make or present or cause to be made or presented to a health care payer a claim for a health care payment knowing the claim to be false.

(2) No person shall knowingly present to a health care payer a claim for a health care payment that falsely represents that the goods or services were medically necessary in accordance with professionally accepted standards. Each claim that violates this subsection shall constitute a separate offense.

(3) No person shall knowingly make a false statement or false representation of a material fact to a health care payer for use in determining rights to a health care payment. Each claim that violates this subsection shall constitute a separate violation.

(4) No person shall conceal the occurrence of any event affecting his or her initial or continued right under a contract, certificate, or policy of insurance to have a payment made by a health care payer for a specified health care service. A person shall not conceal or fail to disclose any information with intent to obtain a health care payment to which the person or any other person is not entitled, or to obtain a health care payment in an amount greater than that which the person or any other person is entitled.

…

(6) A person who violates this section is guilty of a class C felony punishable under chapter 9A.20 RCW.

[7] Under Section 18.130.190(7)(a), unlicensed practice of a profession or operating a business for which a license is required by the chapters specified in RCW 18.130.040, unless otherwise exempted by law, constitutes a gross misdemeanor for a single violation. RCW § 18.130.190.

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 25

McCormick Barstow, LLP
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

with a crime initially before an action can be brought under little RICO. All that is needed is for Allstate to show that it sustained injury to its business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity. As discussed above in greater detail in regards to the Federal RICO claim, the undisputed evidence establishes all requisite elements necessary to establish a RICO violation, whether brought under the Federal Statute or the Washington state statute, which is interpreted generally in accordance with Federal RICO.

Chapter 48.30A of the RCW is entitled "Insurance Fraud" and is in part precisely aimed at the activity of paying for referrals of patients at issue in this case. The statute prohibits (1) service providers from paying for referrals; (2) individuals from accepting payments for referrals; and perhaps most significantly (3) service providers from providing services if they know the patient was obtained as a result of the improper referral. RCW 48.30A.015(1). Any violation is considered "trafficking in insurance claims," with a single violation being a gross misdemeanor, and multiple violations giving rise to a Class C felony. RCW 48.30A.015(4). The intent of the statute to combat any activity related to paying for referrals of patients is abundantly clear.

Clearly, the statute encompasses TMT and TRT as service providers for any referrals to TMT and TRT from doctors, chiropractors, or law firms for which TMT and TRT then paid out some tangible benefit like $100 gift cards. (UMF Nos. 31-34.) Nate Lemings testified that this is precisely the scheme operated by Andrew Jacobs: Jacobs would pay other providers, tow truck drivers, and collision centers for referrals of patients to TMT and TRT. He would also pay for referrals to McLaughlin Law, particularly to employees of TMT and TRT to refer the patients already under Jacobs' control, in order to maximize his profit. He would then funnel money out of McLaughlin Law through DSM to both cash out on his fraud scheme, and further fund the improper gifts.

The unlawful practice of law is also a crime, and is defined in part to include either "[a] nonlawyer [who] knowingly holds an investment or ownership interest in a business primarily engaged in the practice of law [... and/or a] nonlawyer shar[ing] legal fees with a legal provider."

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 26

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

RCW 2.48.180(2)(c), (e).  Here, there is ample testimony that Andrew Jacobs maintained an ownership interest in McLaughlin Law.  (UMF No.15, 23-24.)  At the very least, it is clear that he had a financial interest in McLaughlin law, as demonstrated by splitting fees for personal injury cases with McLaughlin.  (UMF No.77.)  There is little doubt that Jacobs was involved in the unlawful practice of law in the operation of McLaughlin Law.

Further, Andrew Jacobs was engaged in the unlicensed practice of a profession or business as defined in RCW 18.130.190(7) by his ownership and control of TMT and TRT without being a licensed massage therapist or physical therapist, or having some other professional designation allowing the operation such clinics such as a chiropractor or medical doctor.

**E.**     **Count Four - Allstate's Undisputed Evidence Also Supports Summary Judgment on the Fraud and Intentional Misrepresentation Claim**

The nine elements of intentional misrepresentation (fraud) are: (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon the representation; and (9) damages suffered by the plaintiff.  *Carlile v. Harbour Homes, Inc.,* 147 Wash. App. 193, 204-205 (2008); see also *W. Coast, Inc. v. Snohomish Cnty.,* 112 Wash. App. 200, 206 (2002); *Stiley v. Block,* 130 Wash.2d 486, 204 (1996).

Just as above with the Federal and State RICO claims, there is abundant undisputed evidence to establish this claim as a matter of law.  As detailed above, the facts that give rise to mail fraud under the Federal RICO cause of action apply equally to the claims for common law fraud and intentional misrepresentation, and therefore, partial summary adjudication is warranted.

**F.**     **Count Five – Allstate's Undisputed Evidence Establishes A Conspiracy To Defraud Claim**

Washington law does not set forth specific requirements for pleading conspiracy to defraud.  Generally, however, "[a] conspiracy is a combination of two or more persons who

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 27

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

contrive to commit a criminal or unlawful act, or to commit a lawful act for criminal or unlawful purposes." *Adams v. King Cnty.*, 164 Wash.2d 640, 660 (2008), *citing John Davis & Co. v. Cedar Glen # Four, Inc.*, 75 Wash.2d 214, 223 (1969). "For there to be a conspiracy, appellants must establish that respondent entered into an agreement of some kind with the other alleged conspirators to accomplish the object of the conspiracy." *John Davis & Co.*, *supra*, 75 Wash.2d at 223, *citing Corbit v. J. I. Case Co.*, 70 Wash.2d 522 (1967); *see also O'Brien v. Larson*, 11 Wash. App. 52, 55 (1974) ["A civil conspiracy is a combination of two or more persons agreeing to commit a criminal or unlawful act, or to commit a lawful act by criminal or unlawful means, or by concerted action to accomplish a lawful or unlawful purpose by unlawful means."].

As noted above in great detail in support of the claim under Section 1962(d), there is abundant undisputed evidence to establish as a matter of law that defendants conspired to defraud Allstate and thus, partial summary adjudication should be granted.

## G. Count Six – Allstate's Undisputed Evidence Establishes a Violation of the Consumer Protection Act

The Washington legislature has encouraged private claims under the state's Consumer Protection Act. "Any person who is injured in his or her business or property by a violation of RCW 19.86.020, 19.86.030, 19.86.040, 19.86.050, or 19.86.060, or any person so injured because he or she refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of RCW 19.86.030, 19.86.040, 19.86.050, or 19.86.060, may bring a civil action in superior court to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including reasonable attorney fees. In addition, the court may, in its discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained…." RCW 19.86.090.

In this instance, Allstate has brought a private CPA action. "[F]ive elements, all statutorily based, must be established by a plaintiff in order that he or she prevail under a private CPA action." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash.2d 778, 784-785 (1986) ("*Hangman Ridge*"). "The first element of a private CPA action is an unfair or

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 28

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

deceptive act or practice." *Id.*, *citing* RCW 19.86.020. "A plaintiff need not show that the act in question was intended to deceive, but that the alleged act had the capacity to deceive a substantial portion of the public." *Hangman Ridge, supra*, 105 Wash.2d at 785, *citing State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wash.2d 298 (1976)

"The second element which a private plaintiff must establish is that the act or practice complained of occurred in the conduct of trade or commerce." *Hangman Ridge, supra*, 105 Wash.2d at 785, citing RCW 19.86.020. "The Legislature has broadly defined the terms 'trade' and 'commerce' to include 'the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington.'" *Id., citing* RCW 19.86.010(2). "The CPA, on its face, shows a carefully drafted attempt to bring within its reaches every person who conducts unfair or deceptive acts or practices in any trade or commerce." *Id.*, *citing Short v. Demopolis*, 103 Wash.2d 52, 61 (1984).

These first two elements "may be established by a showing that (1) an act or practice which has a capacity to deceive a substantial portion of the public (2) has occurred in the conduct of any trade or commerce. Alternatively, these two elements may be established by a showing that the alleged act constitutes a per se unfair trade practice. A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Hangman Ridge, supra*, 105 Wash.2d at 785-786.

The facts herein establish the first two elements of this cause of action. Here, there are numerous actions done by or at the direction of Andrew Jacobs that have the capacity to deceive a substantial portion of the public. The first such deception is that TMT and TRT were legally operating entities operating in compliance with State law with respect to the corporate practice of medicine. (UMF No.1-4, 9-12, 80-86.) Similarly, another series of deceptive acts involved the care provided at TMT and TRT, and that it was designed to be patient-centered, when in fact it was profit-driven as Andrew Jacobs required quotas for patient treatment. (UMF No. 45.) Additionally, there is a further series of deceptive acts with respect to the operation of McLaughlin Law. Claimants believed that the law firm was acting to legitimately represent them

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 29

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

in their personal injury claims, when in fact Andrew Jacobs and Wesley McLaughlin were operating to maximize their own payout, through full payment of TMT and TRT liens and attorney fees at the expense of net payout to the claimant. There is no doubt these acts were in the course of trade and commerce, as they were perpetrated through businesses operating in Washington that appeared legitimate to the public. Trade and commerce are broadly defined by statute to include "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010(2).

"The third element is that of a public interest showing." *Id.* at 787. The *Hangman Ridge* decision spent a considerable amount of time analyzing the public interest element of a private CPA claim. Since the *Hangman Ridge* decision, however, the Washington legislature has codified this element, and the Consumer Protection Act now provides that, "[i]n a private action in which an unfair or deceptive act or practice is alleged under RCW 19.86.020, a claimant may establish that the act or practice is injurious to the public interest because it: (1) Violates a statute that incorporates this chapter; (2) Violates a statute that contains a specific legislative declaration of public interest impact; or (3)(a) Injured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons." RCW 19.86.093.

The facts herein also establish as a matter of the law this element of the cause of action. As discussed under State RICO above Andrew Jacobs, directly and through the enterprise, was involved in and controlled the trafficking of insurance claims in violation of RCW 9A.82.015. RCW 9A.82.005 specifies the intent of the insurance fraud statute: "[t]he legislature finds that the business of insurance is one affected by the public interest." As such, the trafficking of insurance claims also satisfies the public interest element pursuant to RCW 19.86.093(2).

The same is true for the unlicensed practice of healthcare under RCW 18.130.190. There is undisputed evidence Andrew Jacobs owned and controlled TMT and TRT without maintaining a proper license to operate such clinics. RCW 18.130.050 states that the Chapter on Regulation of Health Professions that includes this licensure restriction is intended "to strengthen and consolidate disciplinary and licensure procedures for the licensed health and health-related

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 30

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

professions and businesses … the purpose of which is to assure the public of the adequacy of professional competence and conduct in the healing arts." As such, the unlicensed practice of medicine by Andrew Jacobs in operating TMT and TRT also satisfies the public interest element pursuant to RCW 19.86.093(2).

Finally, it is also undisputed that Andrew Jacobs was targeting auto insurance companies as his source of recovery for the TMT and TRT bills and personal injury settlements. Allstate is just one of numerous auto insurers doing business in Washington state. As such, other insurers were either injured or had the capacity to be injured by this fraud scheme, satisfying the public interest element pursuant to RCW 19.86.093(3).

"The fourth element of a private CPA action requires a showing that plaintiff was injured in his or her "business or property"." *Hangman Ridge, supra*, 105 Wash.2d at 792, *citing* RCW 19.86.090. "The fifth element is that of causation. Only a person 'injured in his business or property by a violation of RCW 19.86.020 ...' may bring a private action… A causal link is required between the unfair or deceptive acts and the injury suffered by plaintiff." *Id.*, at 792-793.

It is undisputed that Allstate has been injured in its business or property by the acts of the Defendants, and it was the unfair or deceptive acts of the Defendants which cause the injury. Allstate paid PIP claims for bills submitted by TMT and TRT. Unknown to Allstate at the time they were submitted, these bills were both illegal and unrecoverable, and were inflated as they included charges for services beyond what was reasonably necessary. The same is true of the third party settlements, which incorporated the TMT and TRT bills, and further damaged Allstate by increasing the general damages. Causation is clear: but for the submission of these improper bills from TMT and TRT, Allstate would not have issued or considered payment for said services pursuant to the respective auto policies.

## IV.  CONCLUSION

Based on the above, Allstate respectfully seeks partial summary judgment from this Court against remaining Defendants Andrew Jacobs and Direct Solutions Marketing, Inc., and seeks an

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 31

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700

1 Order finding that each Defendant is liable to Allstate under the following causes of action as it

2 relates to the 179 claims at issue in this matter:

3      Count One:     Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §
                       1962(c) – Conduct of Enterprise Through Racketeering
4
       Count Two:     Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. §
5                      1962(d) – Conspiracy

6      Count Three:   Washington RICO Violations – RCW 9A.82.100

7      Count Four:    Fraud and Intentional Misrepresentation

8      Count Five:    Conspiracy to Defraud

9      Count Six:     Violation of the Washington Consumer Protection Act, RCW 19.86, et
                       seq.
10
   DATED: July 7, 2015                    McCORMICK BARSTOW, LLP
11
                                          By:  _____*s/Eron Z. Cannon*_____
12                                        Eron Z. Cannon, WSBA 42706
                                          eron.cannon@mccormickbarstow.com
13                                        By:  _____*s/Jennifer M. Smitrovich*_____
                                          Jennifer M. Smitrovich, WSBA 37062
14                                        jennifer.smitrovich@mccormickbarstow.com
                                          By:  _____*s/Michael J. Schmidt*_____
15                                        Michael J. Schmidt, WSBA 43582
                                          michael.schmidt@mccormickbarstow.com
16                                        800 5th Avenue, Suite 4100
                                          Seattle, Washington 98104
17                                        Phone (206) 576-3700
                                          Fax (206) 576-3720
18
                                          Attorneys for *ALLSTATE INSURANCE
19                                         COMPANY, ALLSTATE PROPERTY &
                                          CASUALTY INSURANCE COMPANY,
20                                        ALLSTATE INDEMNIT COMPANY, and
                                          ALLSTATE FIRE & CASUALTY INSURANCE
21                                        COMPANY*

22

23

24

25

26

27

## <u>CERTIFICATE OF SERVICE</u>

I certify under penalty of perjury under the laws of the state of Washington that the following is true and correct.

I am over the age of 18, competent to testify, not a party to this action, and employed by the firm of McCormick Barstow, LLP.   On the date set forth below, I served the document(s) to which this is attached in the manner noted, on the following person(s):

| | |
|---|---|
| Andrew Jacobs | *Pro Se* |
| 1228 La Cienega #303 | |
| W. Hollywood, CA 90069 | *and* |
| andy_jacobs1@hotmail.com | |
| VIA ECF and Email | *As Registered Agent for Direct Solutions Marketing, Inc.* |

SIGNED at Seattle, Washington, this 7th day of July, 2015.

*s/ Justin Fodness*
Justin Fodness

ALLSTATE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT
(3:13-CV-5214) - 33

**McCormick Barstow, LLP**
800 5th Avenue, Suite 4100
Seattle, Washington 98104
(206) 576-3700