HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ALLSTATE INSURANCE COMPANY, et al,

Plaintiff,

v.

TACOMA THERAPY, INC., et al,

Defendant.

CASE NO. C13-5214RBL

FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW the Court, following grant of Partial Summary Judgment on Liability [Dkt. #176], the ensuing trial on the issue of damages (August 15 and 23, 2016), and hereby enters its Findings of Fact and Conclusions of Law.

## **FINDINGS OF FACT**

1. In 2006, Andrew Jacobs incorporated Tacoma Therapy, Inc., ("TMT"), a massage therapy clinic. Andrew Jacobs owned the clinic along with his wife, Melanie Jacobs.

2. Andrew Jacobs filed the incorporation papers for TMT and was a controlling officer from its inception to its sale in 2012. However, Andrew Jacobs was never licensed in the State of Washington as a massage therapist.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1

3. Andrew Jacobs managed TMT, with limited input from his wife, and exercised control over all business decisions.

4. It was the practice of TMT to focus on treating car accident patients who were either covered by Personal Injury Protection under their auto policies, or were represented by counsel in a personal injury claim against another driver.

5. Andrew Jacobs kept TMT focused on such clientele so that he could manipulate the amount of treatment received by the patients with no out-of-pocket cost to the patient, instead passing the cost on to insurance companies such as Allstate.

6. In 2008, Andrew Jacobs incorporated Tacoma Rehabilitation Therapy, Inc., ("TRT"), a physical therapy clinic. Andrew Jacobs owned the clinic along with his wife, Melanie Jacobs.

7. Andrew Jacobs signed the incorporation papers for TRT and was a controlling officer from its inception to its sale in 2012. Andrew Jacobs was never licensed in the State of Washington as a physical therapist, nor was his wife Melanie Jacobs. Andrew Jacobs managed TRT as well, and exercised control over all business decisions.

8. Andrew Jacobs established and funded Wesley McLaughlin, as the Law Office of McLaughlin & Associates, Inc., whose primary focus was personal injury auto accidents. Andrew Jacobs admitted in his deposition to the law firm being a 50/50 partnership, with profits to be split.

9. Andrew Jacobs' goal was to direct TMT patients to McLaughlin Law, and vice versa, so that Andrew Jacobs would not only profit off of the inflated massage therapy treatment, but also profit on the back end by way of collecting attorney fees out of the general damages portion of a personal injury settlement.

10. Andrew Jacobs relied upon Nate Lemings to help direct the trafficking of patients to and from the law firm. Lemings, a non-attorney, was an employee of McLaughlin Law, which in turn made him Jacobs' employee, as Jacobs held an ownership interest in McLaughlin Law.

11. Lemings described his role in this scheme in detail at his deposition. Lemings started working for McLaughlin Law in 2006 as the "marketing director." Lemings stated that he knew Andrew Jacobs had an ownership interest in McLaughlin Law from around the time that he started working there in 2006. Andrew Jacobs later told Lemings that he was a 50/50 owner of McLaughlin. Lemings was told that his job duties were to market the law firm to medical providers, tow companies and collision centers. At Andrew Jacobs' direction, this marketing consisted of distributing gift cards and cash to other medical providers and tow truck drivers for referrals to McLaughlin Law. He was told to provide gift cards ($100 Visa Cards) to medical providers in exchange for referral of clients to McLaughlin Law. Specifically, Lemings stated that employees of TMT and TRT, as well as employees of tow companies and collision centers, were given gift cards and cash payments for referral of clients to McLaughlin Law. Lemings testified that a majority of McLaughlin Law clients came from TMT and TRT.

12. Lemings stated that massage therapists and physical therapists at TMT and TRT were paid $100 bonuses, typically gift cards, for referring patients to McLaughlin Law. In addition, employees that proved to be top referral sources to McLaughlin Law were given additional gifts such as jackets, iPads, dinners, and vacations.

13. Andrew Jacobs also instructed employees to hand out gift cards to referring providers so that they would refer patients to TMT and TRT.

14. Lemings signed payroll at TMT and TRT from time to time, and was involved in the hiring and firing of Tacoma employees. However, he was paid only from McLaughlin Law.

15. Andrew Jacobs drafted, signed and issued a handbook to its employees entitled "Tacoma Therapy, Inc. Office Policy Handbook" - in which he listed himself as "owner" – which instructed employees on providing massage therapy and physical therapy to patients.

16. There was a "quota" system in place, which required practitioners to treat a minimum number of patients per week, and treat patients a minimum number of times before being released. Employees could be and were fired if they did not meet their minimum quotas as stated in The Handbook.

17. The threat of being fired for not meeting the minimum pre-programmed quotas caused numerous employees to treat patients well beyond what was reasonable and necessary. Former patients testified that they felt over-treated.

18. Andrew Jacobs also instituted what can be described as a "Patient Retention Program" whereby he paid employees bonuses based on the number of times they treated a patient. This program unethically incentivized the staff to see patients beyond what was medically necessary. Further, the TMT massage practitioners were told to see individual patients, at a minimum, for 32 total visits, and would receive cash bonuses if they hit the targets of 32 and 41 visits.

19. The massage practitioners, for example, would receive a $50 bonus for providing a patient with 32 massages, and a $150 bonus for 41 massages. The Patient Retention Program was tracked on a form that was kept within the claimant's medical file. However, the billing coordinator, Meghan Lawrence, was instructed by Andrew Jacobs to not disclose that form pursuant to a subpoena or request for medical records from an insurance company. Employees were known to track down patients to get them to come in for more treatment so they could get their bonuses and to meet their required quota.

20. He instructed his employees to bill up to a certain dollar amount ($6,500) on massage, because billing more than that amount would not be convincing to a judge or arbitrator. Conversely, in third party claims, Andrew Jacobs required the massage practitioners and physical therapists to cease treating their patient if the patient was unrepresented after five visits, as he considered these patients a financial liability.

21. Allstate's expert, Dr. Edward Dagher, is a Board Certified Physiatrist, well-versed in assessing physical therapy and massage therapy treatment received by the underlying claimants at issue here. Dr. Dagher reviewed medical records and bills for all 168 of the underlying claims at issue in this case.

22. In his opinion, which is detailed in his expert report, Dr. Dagher concluded that the records contained:

- Pattern of pre-determined, pre-programmed, unsubstantiated care that had nothing to do with patient care;
- Exaggerated clinical findings;
- Metastasis of treatment;
- Inappropriate referrals;
- Unreasonable charges;
- Misleading clinical information;
- Reports of physical findings that were not supported within reasonable medical probability;
- Modes of care that were not supported as medically necessary;
- Clearly excessive treatments; and
- Unreasonably high charges for treatments.

These findings lead Dr. Dagher to conclude that the course of treatment provided at both TMT and TRT was often exaggerated.

23. In the vast majority of cases, Dr. Dagher recommended a substantial reduction in the number of treatments rendered at TMT and TRT.

24. Allstate paid on these underlying claims two ways. First, Allstate paid TMT and TRT directly on PIP claims when TMT and TRT would submit their invoices to Allstate, either by mail, email, or fax, for reimbursement under the respective Allstate auto policy's PIP coverage. Allstate would also issue payments to attorneys for the underlying claimants in third party or UIM claims. TMT and TRT would submit invoices to the respective attorneys, and in turn the attorneys would make a demand upon Allstate based on said documentation, communicated either by mail or email to Allstate. A substantial number of these third party cases were handled by McLaughlin Law.

25. Andrew Jacobs started a "marketing" company, Direct Solutions Marketing, Inc. ("DSM"). McLaughlin Law made substantial payments to DSM for "marketing" services, when in fact little legitimate marketing was ever actually conducted by DSM. The reality was that DSM was just a conduit for Andrew Jacobs to collect his share of law firm profits.

26. From 2008 to 2012, McLaughlin Law transferred over $1 million to DSM accounts. Andrew Jacobs admits that money was transferred for his share of profits from personal injury settlements. Lemings testified that DSM was started to funnel money from the law firm to Jacobs.

27. The payments from McLaughlin Law to Andrew Jacobs and DSM from 2007 to 2009, and the "Flyte" personal injury settlement payment in 2010, were deliberately off the books of McLaughlin Law. The reason the transactions were "off the books" was to conceal that

Andrew Jacobs either had an ownership interest or at a minimum, a financial interest in McLaughlin Law.

28. It is illegal for laypersons to own or operate a healthcare facility. Specifically, licensed healthcare providers may only operate as a professional service corporation (PS), professional limited liability company (PLLC), or limited liability partnership (LLP) in the State of Washington, and unlicensed persons may not be shareholders, directors, or officers in a PS, PLLC, or LLP. It is undisputed that Andrew Jacobs was not a licensed massage therapist or physical therapist, and therefore could not own a massage clinic or therapy clinic.

29. Andrew Jacobs also managed and controlled McLaughlin Law up until the Fall of 2012, when Jacobs "sold" his interest in McLaughlin Law  The sale is memorialized in a "non-compete" agreement involving DSM. While on its face the "non-compete" agreement involves marketing, the contents demonstrate both that Jacobs was sharing profits from McLaughlin Law, and the level of control Andrew Jacobs claimed to have over the active files at McLaughlin Law. Andrew Jacobs even included a provision in the non-compete that he could have McLaughlin's files moved to another law firm for non-payment. Jacobs admitted at his deposition that he sold his ownership interest in McLaughlin Law in 2012 for $1.4 million.

30. Jacobs admitted the contract really represented the buyout of his share of McLaughlin Law.

31. Allstate relied upon the factual representations made by Defendants, both through invoices submitted directly from TMT and TRT, and in communications received from McLaughlin Law and other law firms involving treatment at TMT and TRT. Allstate relies upon demand packages from attorneys when evaluating claims. Allstate also relies upon invoices from medical service providers when evaluating claims. Both demand packages and TMT/TRT

invoices were sent to Allstate, either by U.S. Mail, email, or facsimile. Allstate issued payments on the underlying claims based on these misrepresentations, with all Allstate checks processed and issued from Houston, Texas.

32. Allstate's total payments to TMT and TRT on the 168 underlying claims at issue, together with general damages totals $899,860.39. Allstate claims that had they been aware of the fraud being conducted by Defendants, it would not have paid any amount directly to TMT and TRT for the purported services provided to the underlying claimants, nor would Allstate have considered TMT and TRT invoices in evaluating any third party claim. This claim is dubious under the circumstance of substantial services being provided to the target patients.

## **CONCLUSIONS OF LAW**

1. The Districts Courts of the United States have jurisdiction to prevent and restrain violation of 18 U.S.C. § 1862, including awarding actual damages to a person, including a corporation, injured by a criminal enterprise. 18 U.S.C. § 1964.

2. Andrew Jacobs operated a criminal enterprise by operating TMT, TRT, McLaughlin & Associates and DSM in such a way as to inflate medical bills and related legal bills to injure insurance companies, including Allstate. Pursuant to the quota and patient retention system established by Jacobs, his employees wound up performing unnecessary treatments that drove the fraud. Further, Andrew Jacobs was responsible for hiring and directing Nate Lemings, who was instructed to "steer patients to the enterprise" by getting patients not only to TMT and TRT, but also to McLaughlin Law. Finally, the proceeds from fraudulent billings either flowed to Jacobs through TMT and TRT directly in the first party cases, or indirectly in the third party cases when McLaughlin would settle cases in part based on TMT and TRT bills. Jacobs would collect his gains by laundering the money through DSM, under the auspices of marketing expenses. Andrew Jacobs operated and managed the enterprise throughout its lifecycle.

3. A "pattern of racketeering activity" is defined in the statute to be "at least two acts of racketeering activity" occurring within a ten year period. 18 U.S.C. § 1961(5). To constitute a "pattern" the predicate acts must be "related" and "continuous." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The requirement that the predicate acts be "related" means that "they share similar purposes, participants, victims, methods, or other distinguishing characteristics; in short they must not be isolated or sporadic." *See Howard v. Am. Online, Inc.,* 208 F.3d 741, 749 (9th Cir. 2000); *Wegbreit v. Marley Orchards Corp.*, 793 F. Supp. 957, 963 (E.D. Wash. 1991) reinstatement granted, 793 F. Supp. 965 (E.D. Wash. 1992) [Predicates are related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.]

4. Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C. § 1341. So, any "mailing that is incident to an essential part of the scheme satisfies the mailing element," even if the mailing itself "contain[s] no false information." *Bridge v. Phoenix Bond & Indem. Co.*, 128 S.Ct. 2131, 2138 (2008). Under the mail fraud statute, the question is not whether each defendant actually used the mail but whether each defendant could have reasonably foreseen that the mail would be used as part of the underlying scheme. *See Ikuno v. Yip,* 912 F.2d 306, 311 (9th Cir. 1990); *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir. 1989).

5. Here, the evidence demonstrated that there are at least 168 separate mailings and/or wire transmissions of information included within medical records, diagnoses, and/or treatments provided at TMT and TRT. This includes sending medical records and bills to attorneys for claimants, including McLaughlin Law, which in turn forwarded these records and bills to Allstate in demand packages. It also includes TMT and TRT directly submitting records and bills directly to

Allstate, all for the purposes of carrying out the enterprise's fraudulent scheme. The predicate acts further consist of mailing and/or wire transmissions of fraudulent information to Allstate designed to enhance the value of the underlying claimants' cases for purposes of supporting those claimants' artificially enhanced settlement demand. Specifically, McLaughlin Law mailed demand packages to Allstate, and TMT and TRT sent invoices to Allstate through the mail. Andrew Jacobs expected that Allstate would issue payments in response to these invoices and demand packages, and utilize the mail in sending these payments. Further, Andrew Jacobs frequently relied upon text messages to direct funds to various accounts and business entities, in particular with Nate Lemings.

  6. The pattern of racketeering activity caused damage to Allstate in the form of paying higher settlements of the claims being made against its insureds. All of the medical bills for services from TMT and TRT arise from illegal entities operated in violation of the corporate practice of medicine and the Washington Professional Service Corporation Act, RCW 18.100, *et seq*.

  7. Through the pattern of racketeering activity, the defendants violated Washington's Consumer Protection Act ("CPA") establishing each of these elements:

> 1. An unfair or deceptive act or practice;
> 2. Occurring in trade or commerce;
> 3. That impacts the public interest;
> 4. Injury to his business or property; and
> 5. That the injury was proximally caused by the unfair or deceptive act.

*Hangman Ridge Training Stables v. Safeco Title Ins. Co., 105 Wn.2d 778, 784-85, 719 P.2d 531, (1986).* The first two elements of a CPA claim is established by the following: …[T]hat (1) an act or practice which has the capacity to deceive a substantial portion of the public (2) has occurred in the conduct of any trade or commerce. *Hangman Ridge, supra at 785.* The illegal ownership and operation of the Tacoma entities violated the CPA. The bills submitted to Allstate were deceptive in nature not only to Allstate but to the public, as their bills were solely based upon revenue

enhancement and not for legitimate treatment of individual patients. Allstate was injured by the illegal formation and operation of the Tacoma entities.

8. These illegally inflated claims caused Allstate damages as nothing should have been paid to or for services from TMT and TRT. Yet Allstate did in fact issue payments based in part on TMT and TRT bills in all 168 claims at issue.

9. Additionally, this fraud scheme led to inflated treatment for the 168 underlying claims based on Andrew Jacobs' direction and control of his treating employees. All of the medical bills for services from TMT and TRT arise from an illegal fraud scheme amounting to mail fraud. Andrew Jacobs directed his employees to treat TMT and TRT patients not based upon clinical need, but based on quotas, focused on driving up bills and inflating claims.

10. Due to this fraud scheme, Allstate's expert, Dr. Dagher concluded that the vast majority of the 168 underlying claims receive treatment far beyond what was medically necessary. Dr. Dagher provided his expert opinion on each claim as to what the appropriate level of care would have been had the claimants been treated based on clinical necessity. Because Dr. Dagher has concluded the level of treatment was inflated, Allstate was necessarily damaged where it paid beyond what was medically necessary for these 168 claims.

11. Andrew Jacobs masterminded a complex fraud scheme involving numerous individuals and business entities, where the purpose was to fraudulently inflate medical bills and associated personal injury settlements paid by insurance companies such as Allstate. Andrew Jacobs improperly and illegally owned and controlled businesses, including two healthcare entities and a law firm, that he used to run up unnecessary medical billings and associated personal injury settlements, which were paid by auto insurance carriers such as Allstate. Andrew Jacobs used improper referral and kickback schemes with payoffs to other medical providers, tow truck companies, and collision centers to drum up business for his massage and physical therapy clinics. He also used kickbacks with his own healthcare employees to get referrals to his law firm, in order to keep as much control

as possible over the money generated from the improper treatment at his clinics. Jacobs started and used DSM to launder money from his illegally-owned law firm, moving the money both back into his pocket and using it as a slush fund for the illegal kickbacks and payoffs.

12. The measure of civil damages under RICO is the harm caused by the predicate acts constituting the illegal pattern. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts. *Id.* at 497.

13. Federal courts have held that where the injury is established, as it has been here, *damages need not be demonstrated with precision. New England Carpenters Health Benefits Fund v. First Databank, Inc.,* 248 F.R.D. 363, 371 (D. Mass. 2008) (emphasis added). In relating RICO cases to antitrust cases, the Court concluded, where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it will be enough if the evidence shows the extent of damage as a matter of just and reasonable inference, although the result is only an approximate. *Id.* at 371.

14. As established, the purpose of the illegal scheme here was to fraudulently inflate medical bills and associated personal injury settlements paid by insurance companies such as Allstate. As part of that racketeering activity, Andrew Jacobs improperly and illegally owned and controlled businesses, including two healthcare entities and a law firm, that he used to run up unnecessary medical billings and associated personal injury settlements, which were paid by auto insurance carriers such as Allstate. Allstate paid invoices of TRT and TMT for services performed by illegal operations under Washington law.

15. Nevertheless, the actual damage caused to Allstate was far less than stated by Allstate. Allstate is an insurance company that accepts, for a fee, the risk to reimburse injured parties either directly injured by Allstate or those who are injured by Allstate insureds. Allstate deserves to operate its business in a system that is honest and above board. Operations like the defendants destroy the integrity of the legal and medical professions. The actual losses by their fraud are impossible to measure with precision.

16. The 168 patients involved in this case all suffered actual accidents. They all were seen by actual doctors who authorized actual treatments of massage and/or physical therapy. These patients all were actually treated and all incurred actual medical bills and general damages.

17. Based on the credible evidence and the knowledge of the Court about the tort system, the practice of therapists, doctors and lawyers who cater to the motor vehicle accident victim, the Court awards actual damages to Allstate in the amount of $150,000 , trebled under RICO to $450,000. Further, the Court will award the reasonable attorney fees and costs as reflected in the submittal to be provided by counsel no later than September 12, 2016 and after Mr. Jacobs has an opportunity to respond to the fee application by September 23, 2016

Dated this 2nd day of September, 2016.

/s/ Ronald B. Leighton
Ronald B. Leighton
United States District Judge